IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WILLIAM BENJAMIN KIERNAN,⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀CIVIL NO. 3:12cv459(HEH)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
CAROLYN W. COLVIN,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Commissioner of Social Security,⠀)
⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
_____)

## REPORT AND RECOMMENDATION

⠀⠀⠀⠀William B. Kiernan ("Plaintiff") is 26 years old and served as an active duty member of

the United States Marine Corps. While serving in Afghanistan in 2010, Plaintiff suffered injuries

caused by an explosion from an improvised explosive device ("IED") when Plaintiff attempted

to escape gunfire. As a result of these injuries, Plaintiff alleges that he is disabled. On

September 28, 2010, Plaintiff applied for Social Security Disability Benefits ("DIB") with an

alleged onset date of September 16, 2010. The claim was denied on January 31, 2011, and again

after reconsideration on June 21, 2011. Plaintiff appeared before an administrative law judge

("ALJ") on November 21, 2011, and his claim was again denied. The Appeals Council denied

Plaintiff's request for review on April 30, 2012, making the ALJ's decision the final decision of

the Commissioner of Social Security.

⠀⠀⠀⠀The ALJ concluded that Plaintiff's condition failed to meet the requirements of any of the

listings in 20 C.F.R., Pt. 404, Subpart. P, Appendix 1. (R. at 17.) The ALJ noted that, while

Plaintiff did have a severe impairment due to a fracture of his lower limb and that the impairment

did have more than a minimal effect on his ability to function, it did not affect Plaintiff's ability

to function to the degree that Plaintiff alleged. (R. at 15.) As a result of these findings, the ALJ determined that the claimant was not disabled. (R. at 21.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that substantial evidence fails to support the ALJ's decision regarding listing 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.08. (Pl's Mot. in Supp. for Summ. J. ("Pl.'s Mem.") at 5.) The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 13) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff alleges that the ALJ erred when concluding that Plaintiff did not meet the requirements of listing § 1.08 and therefore determined that Plaintiff was not disabled, Plaintiff's work history, medical history and testimony are summarized below.

A. Education and Work History

Plaintiff attended Virginia Polytechnic Institute and State University ("Virginia Tech") from 2004-08, where he earned a Bachelor's Degree in Urban Development. (R. at 33.) While at Virginia Tech, Plaintiff registered with the Marine Corps and served in the Reserves until called to active duty in December 2009. (R. at 580.) During college, Plaintiff also held a

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

position as an assistant manager at a coffee shop where his duties included supervising three to four people and lifting as much as fifty pounds. (R. at 148.) Upon graduation from Virginia Tech, Plaintiff worked at Centex Homes from 2008-2009 managing schedules and job start dates for homes under construction. (R. at 147.) This position required Plaintiff to work about forty hours a week and to lift up to one hundred pounds. (R. at 147.) He worked at Centex until he was called to active duty and deployed to Afghanistan in December 2009. (R. at 146, 580.)

Plaintiff served as a combat engineer and achieved the rank of Corporal. (R. at 28, 34 580.) His contract with the Marine Corps expired in May 2012. (R. at 580.) Plaintiff has not worked since the alleged onset date, but received full pay and benefits from the military due to his active duty status. (R. at 15, 51.)

B. Medical History

Plaintiff's injuries occurred on September 16, 2010, after an IED exploded in his vicinity while Plaintiff was deployed in Afghanistan. (R. at 202.) As a result of the blast, Plaintiff suffered shrapnel wounds, fractures in the right leg and arm, flesh wounds and a severed nerve in the right leg that limited his mobility. (R. at 202.) Plaintiff had little memory of the ensuing events, but he recalled waking up in a hospital in Germany. (R. at 202.)

Plaintiff arrived at the National Naval Medical Center on September 19, 2010, where he underwent numerous surgical procedures for his injuries. (R. at 202.) Medical records indicate that Plaintiff had seven surgeries in September of 2010 and three additional surgeries in October of 2010. (R. at 313.)

During Plaintiff's initial surgery on September 20, 2010, Dr. Scott Waterman, M.D., operated on his right arm and right lower leg to repair soft tissue wounds, a right epicondyle fracture and a right proximal fibular fracture. (R. at 266-70.) Dr. Waterman noted that many of

3

Plaintiff's nerves were visible and that Plaintiff would need significant skin grafting. (R. at 269-70.)

On September 21, 2010, Plaintiff's mental health was stable. (R. at 328.) Plaintiff stated that his mood was improving each day and he had not had depressive symptoms, anxiety or difficulty sleeping. (R. at 328.) Further, Plaintiff reported no flashbacks or nightmares regarding the incident. (R. at 328.) Plaintiff could converse with others, remember conversations and stated that he would like to finish his contract with the Marine Corps if possible. (R. at 328.)

Thereafter, Plaintiff went through additional irrigation, debridement and skin grafting procedures. (R. at 272-75, 280, 291-92, 294-95, 361, 436-37, 511-12.) On September 22, 2010, Plaintiff underwent his second irrigation and debridement procedure by Dr. Waterman. (R. at 274.) After the surgery, Dr. Waterman noted that it went well and that Plaintiff remained in stable condition. (R. at 275.) Dr. Waterman planned further surgeries within the next week and a split-thickness skin grafting within two weeks. (R. at 275.) Plaintiff was also placed in a Multi-Podus boot. (R. at 275.)

Plaintiff had another procedure on September 26, 2010, in which Dr. Benjamin Quartery, M.D., performed a right buttock wound debridement with a delayed primary closure. (R. at 271.) The physicians sterilized Plaintiff's wounds, then irrigated and debrided the wound before closing it. (R. at 272.) Plaintiff tolerated the procedure without any complications. (R. at 272.) On September 27, 2010, Dr. Waterman performed another irrigation and debridement procedure. (R. at 280.) Plaintiff suffered an intermittent fever and an increased white blood cell count before the procedure, but it was completed with no complications and Plaintiff remained in stable condition. (R. at 281-82.) Dr. Waterman indicated that the infectious disease department

needed to be consulted and that Plaintiff would need additional irrigation and debridement procedures. (R. at 282.)

Plaintiff underwent another irrigation and debridement procedure on September 29, 2010. (R. at 284.) Dr. Waterman noted that he consulted the infectious disease department regarding a possible infection and that Plaintiff was prescribed vancomycin and meropenem to treat infection. (R. at 285.) The surgery was successful and Plaintiff remained in stable condition. (R. at 286.) Records indicate that Plaintiff was to continue on vancomycin and meropenem and undergo another procedure in a few days. (R. at 286.)

On October 4, 2010, Dr. Waterman performed a final irrigation and debridement procedure. (R. at 287.) Following the procedure, Plaintiff returned to the recovery room for rehabilitation. (R. at 289.) Dr. Waterman noted that Plaintiff would need the dressings for his wounds changed repeatedly and that Plaintiff would need to undergo a split thickness skin grafting. (R. at 289.)

On October 12, 2010, Dr. Waterman performed the split thickness skin grafting to Plaintiff's lower right extremity. (R. at 294.) Plaintiff's wound measured fifty two centimeters long and twenty four centimeters wide at its widest point. (R. at 295.) Following the skin graft, Plaintiff's leg was wrapped with an ACE bandage. (R. at 295.) Plaintiff returned to the recovery room in stable condition and received a nerve block from Pain Services. (R. at 296.) Dr. Waterman indicated that Plaintiff required therapy for five days. (R. at 296.) On October 8, 2010, Dr. Waterman performed a negative pressure wound therapy dressing removal under anesthesia without any complications. (R. at 297.)

Thereafter, Plaintiff undertook his own wound care and stated that he was generally satisfied with the way that his leg was healing. (R. at 223.) Plaintiff used a cane, suffered some

pain and decreased movement and strength in his right ankle, but could conduct most activities independently, such as showering and dressing. (R. at 220.) During his October 20, 2010 appointment, Plaintiff demonstrated good balance when moving from sitting to standing with crutches. (R. at 610.) On November 1, 2010, Plaintiff stated that his pain was "under control" and asked to be relieved from taking oxycontin. (R. at 616.)

On November 8, 2010, Plaintiff completed and passed a driver's evaluation. (R. at 205.) During Plaintiff's appointment on November 9, 2010, nurses noted that Plaintiff's gait was steady despite needing a cane to move about. (R. at 212-13.) That same day, Plaintiff completed his outpatient rehabilitation in Richmond, Virginia, and returned home to Pittsburgh, Pennsylvania, to continue outpatient rehabilitation at the local Veterans Affairs Medical Center ("VAMC"). (R. at 454.) Upon discharge, Plaintiff's kinesiotherapist, Joseph M. Orthman, noted that Plaintiff was independently mobile and could walk over level surfaces and up and down stairs without the aid of a cane. (R. at 237.) On November 30, 2010, radiologists noticed that Plaintiff suffered a healing fracture in the distal lateral femoral condyle, but that Plaintiff had a stable appearance of the healing proximal right fibular fracture. (R. at 506.)

On December 7, 2010, Plaintiff underwent a wound care consultation and a physical medicine rehabilitation consultation in which the attending nurse wrote that Plaintiff could walk with the assistance of a cane and that his gait was consistent with someone who had muscle mass loss. (R. at 570.) During his physical medicine rehabilitation consultation, Plaintiff had a "significant" right limp. (R. at 574.) Additionally, Plaintiff complained of pain episodes for which he was prescribed gabapentin. (R. at 574.) The nurse noted that Plaintiff could walk short distances, ascend stairs independently and drive. (R. at 575.)

6

During Plaintiff's January 13, 2011 physical therapy appointment, Plaintiff "continue[d] to do well." (R. at 623-24.) Plaintiff complained of foot drop in his right side, discomfort from the skin graft and numbness in the dorsum of the right foot. (R. at 625.) Plaintiff continued with physical therapy appointments until February 10, 2011, and demonstrated decreased pain and improvement in his conditions. (R. at 630-34.)

On January 26, 2011, the attending nurse noted that Plaintiff looked "well" and could walk without a cane. (R. at 579.) The nurse also noted that the foot drop was still present, but that Plaintiff's gait had improved. (R. at 579.) Plaintiff stated that he had trouble sleeping due to "ruminating" thoughts about his deployment and his injuries. (R. at 580.) Plaintiff was diagnosed with adjustment disorder with anxious features, but tested negative for Post-Traumatic Stress Disorder. (R. at 581.)

In February 2011, Plaintiff complained of a loss in foot dorsiflexion and sensation in his right foot. (R. at 699.) As a result, on February 15, 2011, Plaintiff was referred to Dr. Tanya J. Lekhy, M.D., for an evaluation of the peroneal nerve function. (R. at 699.) After the evaluation, Dr. Lekhy concluded that Plaintiff had a combined injury to his right peroneal and tibial nerve. (R. at 704.) On March 1, 2011, Plaintiff visited Dr. Martin Frederick Baechler, M.D., where Plaintiff demonstrated an improved range of motion in his right ankle and the doctor did not recommend surgery at that time. (R. at 741.) Conditions in the ankle subsequently changed and surgery was performed on March 21, 2010. (R. at 721, 845-46.) Plaintiff was discharged the next day. (R. at 721, 845-46.) Before discharge, Plaintiff spoke with Dr. Fleming about plans for future surgery on Plaintiff's right knee. (R. at 721.)

Plaintiff attended follow-up appointments on March 30, 2011 and April 13, 2011, during which Plaintiff's splint was changed and notes indicated that Plaintiff could not bear weight on

7

his ankle. (R. at 948, 953.) Plaintiff began wearing a weight-bearing splint on April 13, 2011. (R. at 948.) During his April 26, 2011 follow-up appointment, Plaintiff reported no pain. (R. at 943.) Plaintiff was doing well and experienced little pain during his June 8, 2011 appointment. (R. at 935.)

By June 15, 2011, Plaintiff could walk without any aid from a brace or a walker. (R. at 935.) Plaintiff went deep-sea fishing and walked on uneven surfaces to perform community service. (R. at 815.) While these activities sometimes caused him discomfort and pain, Plaintiff reported that his ankle performed well in both circumstances. (R. at 813-14.) By August 2011, Plaintiff indicated during several appointments that the strength and range of motion in his right ankle were improving. (R. at 797-98.) At that point, Plaintiff was waiting to see a doctor to discuss remaining injuries to his knee. (R. at 798.)

On August 21, 2011, Plaintiff suffered increased pain while bowling. (R. at 797.) Plaintiff felt pain after a particular bowl and had a more difficult time walking the next day. (R. at 797.) On August 29, 2011, Plaintiff complained of continued pain in his ankle despite continued elevation, ice and rest. (R. at 795.) Plaintiff used an immobilizer boot for three weeks on August 30, 2011. (R. at 794.)

On September 19, 2011, Plaintiff was diagnosed with a closed fracture of the right fibula. (R. at 921.) Dr. Jeffrey Guiliani, M.D., noted that the appearance of his right knee was abnormal and the right knee was unstable, and recommended an open reduction and internal fixation ("ORIF") procedure of the fibula and rehabilitation. (R. at 915-21.) Dr. Guiliani performed the ORIF procedure on October 6, 2011. (R. at 915.) Plaintiff was released from the hospital on November 11, 2011. (R. at 872.) On November 23, 2011, Plaintiff reported pain and stiffness in

8

the joints of his knee, but he claimed that the pain was under control and that he was "doing well." (R. at 869.)

C. Non-treating State Agency Physicians' Opinions

On January 31, 2011, Dr. A. Serpick, M.D. performed an analysis of Plaintiff's Physical Residual Functional Capacity ("RFC"). (R. at 191.) Dr. Serpick concluded that Plaintiff could occasionally lift up to twenty pounds and could frequently lift up to ten pounds. (R. at 185.) Further, Dr. Serpick found that Plaintiff had the ability to stand or walk for two hours in an eight-hour work day and could sit with normal breaks for six hours of an eight-hour work day. (R. at 185.) Plaintiff also had the ability to occasionally climb ramps or stairs, but could not climb a ladder or scaffolding. (R. at 186.) Dr. Serpick opined that Plaintiff could occasionally kneel, stoop, crouch or crawl, but must avoid concentrated exposure to extreme heat, cold, wetness and humidity. (R. at 186, 188.) He also noted that Plaintiff was healing well, and by January 26, 2011, no longer relied on a cane for moving about. (R. at 191.)

Dr. Martin Cader, M.D., performed a separate RFC Assessment on June 20, 2011. (R. at 50.) Dr. Cader determined that Plaintiff had numerous exertional limitations, namely that Plaintiff could occasionally lift twenty pounds a day, could frequently lift ten pounds a day, and could stand or walk for a total of four hours a day with normal breaks. (R. at 56.) Plaintiff also suffered postural limitations in that he could climb stairs or ramps only occasionally, but could never climb ladders or ropes. (R. at 56.) Plaintiff could also frequently stoop, kneel, crouch and crawl. (R. at 57.) Ultimately, Dr. Cader concluded Plaintiff was not disabled. (R. at 58.) Although the doctor determined that Plaintiff could not return to his previous work as a Combat Engineer, based on the medical records and other information provided, Plaintiff could perform less demanding work that existed in the national economy. (R. at 59.)

9

D. Activities of Daily Living

On February 20, 2011, Plaintiff completed a Function Report describing his Activities of Daily Living ("ADL"). (R. at 158-65.) Plaintiff noted that he woke up around 8 a.m., attended physical therapy or doctors' appointments, ran errands, cared for his dog, cooked dinner, watched television, read and went to bed. (R. at 158.) Plaintiff also took care of his golden retriever. (R. at 159.) Before his injuries, Plaintiff participated in physical activities, ran and walked normally, and slept well at night, but as a result of his injuries, these activities were limited. (R. at 159.)

Plaintiff listed no limitations of his ability to tend to his hygiene and other personal care. (R. at 159.) Plaintiff indicated that he did not need reminders to take care of personal needs and he prepared meals for himself and did chores around the house. (R. at 160.) However, the number of complete meals that Plaintiff prepared for himself during the week diminished. (R. at 160.) Plaintiff could walk and drive a car. (R. at 161.) He shopped three to five times a week for roughly an hour at a time and his injuries did not affect his ability to maintain his finances in any way. (R. at 161-62.)

Plaintiff noted that his injuries altered his ability to engage in his hobbies. The mental aspects of Plaintiff's hobbies remained unchanged, but as a result of his injuries he could not participate in many physical activities. (R. at 162.) Plaintiff marked that he was limited in his ability to lift, squat, walk, climb stairs and complete tasks. (R. at 163.) He indicated that he cannot walk more than half a mile before he needed to rest for up to five minutes. (R. at 163.)

Plaintiff remained social and often went to dinner with friends or went to bars to watch sporting events. (R. at 162.) Further, Plaintiff had no trouble getting along with family or friends. (R. at 163.) Plaintiff had no difficulty paying attention or following written and spoken

instructions. (R. at 163.) Plaintiff's injuries also had no effect on his ability to handle stress or changes in routine. (R. at 164.)

E. Plaintiff's Testimony

Plaintiff testified at a hearing before the ALJ on November 21, 2011. (R. at 28.) Plaintiff stated that he served as an active duty marine combat engineer with the rank of corporal. (R. at 28.) He attended Virginia Tech, where he obtained a Bachelor's Degree in Urban Development. (R. at 33.) At the time of the hearing, he lived in a multi-level home in Richmond, Virginia, with his bedroom upstairs. (R. at 33.)

Plaintiff estimated that he experienced between eleven and thirteen surgeries since the date of his injuries. (R. at 34.) Further, he stated that he had used crutches sporadically since the alleged onset date, depending on when he underwent his surgeries. (R. at 35.) Plaintiff could lift up to fifty pounds, but he would get stiff if he stood for longer than thirty to forty-five minutes at a time. (R. at 36.) He could not sit for longer than two hours before becoming uncomfortable. (R. at 36.)

Plaintiff estimated that he could walk for half a mile at a time. (R. at 37.) He maintained his ability to read, write and drive a car. (R. at 37.) Plaintiff also stated that he shopped for himself, prepared his own food and spent time kayaking a few times per month. (R. at 39.) Plaintiff also rode a stationary bike for exercise. (R. at 41.) Further, he volunteered with the Wounded Warrior Program and Big Brothers Big Sisters for an estimated twelve to fifteen hours per month. (R. at 40.)

In addition to the physical injuries, Plaintiff stated that he had difficulty sleeping since the alleged onset date and went to a psychologist as a result. (R. at 42.) Since his initial surgeries, Plaintiff attended physical therapy three times a week for an hour until his final knee

surgery in October 2011. (R. at 43-44.) He also stated that he understood there to be a recovery time of six to twelve months for his surgeries. (R. at 43.)

## II. PROCEDURAL HISTORY

On September 28, 2010, Plaintiff filed an application for DIB claiming that he was physically disabled due to injuries suffered while deployed in Afghanistan serving in the United States Marine Corps. (R. at 13, 22.) The alleged onset date of the disability was September 16, 2010. (R. at 13.) The claim was initially denied on January 31, 2011, and again on reconsideration on June 21, 2011. (R. at 13.) Plaintiff filed a written request for a hearing on August 16, 2011, and appeared before an ALJ on November 21, 2011, represented by counsel. (R. at 13, 28.) On February 2, 2012, the ALJ denied claimant benefits, concluding that he was not disabled under the Act, because, based on his age, education and work experience, Plaintiff was qualified for jobs in the present national economy. (R. at 20.) The Appeals Council denied Plaintiff's request for review on April 30, 2012, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

## III. QUESTION PRESENTED

Did substantial evidence support the ALJ's determination that Plaintiff did not meet listing § 1.08?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance and is the

kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted). To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[2] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[3] based on an assessment of the claimant's RFC and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through

---

[2]     SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[3]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,* 667 F.3d at 472-73; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5). The Commissioner can carry his burden in the final step with the testimony of a Vocational Expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

### A. The ALJ's Decision

Plaintiff appeared before the ALJ for a hearing on November 21, 2011. (R. at 13). The record was left open for additional evidence and, after the hearing, additional evidence was received and added as Exhibit 15F. (R. at 13.) On February 2, 2012, the ALJ rendered his decision in a written opinion and determined that, based upon the application for DIB filed on

September 28, 2010, Plaintiff was not disabled under §§ 216(i) and 223(d) of the Social Security Act. (R. at 21.)

The ALJ followed the five-step sequential evaluation process as established by the Social Security Act in analyzing whether Plaintiff was disabled. (R. at 14); *see also* 20 C.F.R. § 404.1520(a). First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, but did note that Plaintiff remained on active duty and received full pay and allowances. (R. at 15.) At step two, the ALJ determined that Plaintiff suffered a severe impairment in his lower limb that had more than a minimal effect on the ability to function. (R. at 15.) The ALJ also noted, however, that the impairment did not affect Plaintiff's ability to function to the degree that Plaintiff alleged. (R. at 15.)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. The ALJ stated that he evaluated Plaintiff's injuries under listings § 1.06, § 1.07 and § 1.08. (R. at 17.) The ALJ determined that Plaintiff's injuries also failed to result in an inability to ambulate effectively, as defined by § 1.00B2b. (R. at 17.)

The ALJ further found, at step four of the analysis, that Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (R. at 17.) In reaching this conclusion, the ALJ considered objective medical evidence and opinion evidence. (R. at 18.) The ALJ followed a two-step analysis of whether the medically determinable physical symptoms could reasonably be expected to produce Plaintiff's pain and symptoms, and if so, the extent to which the symptoms limit Plaintiff's functioning. (R. at 18.) The ALJ concluded that, based on the evidence, Plaintiff's impairment could reasonably

be expected to cause the alleged symptoms, but found Plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms to lack credibility. (R. at 19.) Finally, at step five of the analysis, the ALJ concluded, based on Plaintiff's age, education and work experience that significant numbers of jobs existed in the national economy, that Plaintiff could perform. (R. at 20.)

Plaintiff challenges the ALJ's decision at step three, arguing that the ALJ's determination that Plaintiff did not meet listing § 1.08 is not supported by substantial evidence. (Pl.'s Mem. at 5.) Defendant asserts that Plaintiff failed to meet his burden of demonstrating that Plaintiff meets listing § 1.08 and substantial evidence supports the ALJ's decision. (Def.'s Mem. at 10.)

B. Substantial evidence supports the ALJ's finding that Plaintiff did not meet the criteria for listing § 1.08.

At the third step of the ALJ's analysis, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). The ALJ found that Plaintiff's lower limb fractures, "evaluated under sections 1.06, 1.07 and 1.08 do not meet any of the requirements of those sections and have not resulted in an inability to ambulate effectively, as defined in 1.00B2b." (R. at 17.) Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ failed to analyze Plaintiff's impairments under listing § 1.08. (Pl.'s Mem. at 5.)

The listings are a regulatory tool which enable the government to make decisions more efficiently by identifying claimants whose impairments are so severe that they are presumptively disabled, regardless of their age, education and work history. 20 C.F.R § 404.1525(a); *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). For a claimant to qualify for benefits based on a showing

that his impairment meets one of the listed impairments, he must present medical findings equal in severity to *all* of the criteria for the most similar listed impairment. 20 C.F.R. 404.1525(c)(3); *Zebley*, 493 U.S. at 531 (emphasis added).

Listing § 1.08 is met when one has a "[s]oft tissue injury (*e.g.*, burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset." 20 C.F.R., pt. 404, Subpart P, Appendix 1. § 1.08. Section 1.00M defines "under continuing surgical management" as

> surgical procedures and any other associated treatments related to the efforts directed toward salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy.

20 C.F.R., pt. 404, Subpart P, Appendix 1. § 100(M). Section 1.00B(2) defines a loss of function as "the inability to ambulate effectively on a sustained basis." 20 C.F.R., pt. 404, Subpart P, Appendix 1. § 100(B).

"To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." *Id.* The claimant must be able to travel without assistance to and from a place of employment or school. *Id.* The "inability to ambulate effectively" is defined in § 1.00B(2)(b) as "an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk . . . without the use of two crutches, the inability to walk a block at a reasonable pace on rough or uneven surfaces . . . the inability to carry out routine ambulatory

activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single handrail. " *Id.*

Plaintiff argues that the decision lacks substantial evidence to support it, because the ALJ failed to offer any analysis that Plaintiff did not meet listing § 1.08. (Pl.'s Mem. at 5-9.) Defendant argues that substantial evidence throughout the ALJ's opinion supports the ALJ's finding that Plaintiff did not meet the requirements of listing § 1.08 and that Plaintiff failed to meet his burden of proof regarding step three. (Def.'s Mem. at 10.)

At step three, the ALJ must clearly set forth the reasons for his decisions. *Diaz v. Comm'r of Social Sec. Admin.*, 577 F.3d 500, 504 (3d Cir. 2009). "Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient." *Id.* In conducting their analysis, the ALJ should identify the relevant listed impairments and then compare the criteria of each listing with evidence of Plaintiff's symptoms. *Cook v. Heckler*, 783 F. 2d 1168, 1173 (4th Cir. 1986); *Brascher v. Astrue*, 2011 WL 1637029, at *4-5 (E.D. Va. Mar. 11, 2011). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook*, 783 F.2d at 1173. However, if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination. *Smith v. Astrue*, 457 Fed. App'x. 326, 328 (4th Cir. 2000) (citing *Fisher-Ross v. Barnhart*, 431 F.3d 729. 733-34 (10th Cir. 2005)). The ALJ need only review the medical evidence once in the opinion to analyze Plaintiff's condition. *McCartney v. Apfel*, 28 Fed. App'x 277, 279 (4th Cir. 2002).

The ALJ, in finding that Plaintiff did not meet listing 1.08, stated only that

> [Plaintiff's] lower limb fractures, evaluated under sections 1.06, 1.07 and 1.08 do not meet any of the requirements of those sections and have not resulted in inability to ambulate effectively, as defined in 1.00B2b.

> [Plaintiff] does not have an impairment that meets/equals; singularly or in combination, any impairment listed in Appendix 1.

(R. at 17). While the ALJ provided a brief conclusion at step three, substantial evidence exists in the ALJ's opinion and in the record to support this finding.

Plaintiffs treating doctors' records indicate that on November 8, 2010, Plaintiff completed and passed a driver's evaluation. (R. at 205.) During a November 9, 2010 doctor appointment, nurses noted that Plaintiff's gait was steady despite needing a cane to move about. (R. at 212-13.) Plaintiff's kinesiotherapist, Joseph M. Orthman, opined that Plaintiff was independently mobile and could walk over level surfaces and up and down stairs without the aid of a cane. (R. at 237.) During another appointment, notes indicated that Plaintiff could walk short distances and ascend stairs independently. (R. at 575.) By July 2011, Plaintiff could walk without any aid from a brace or a walker. (R. at 935.) Plaintiff went deep-sea fishing and walked uneven surfaces to perform community service. (R. at 813-14.)

A non-treating state agency physician, Dr. A. Serpick, M.D., found that Plaintiff had the ability to stand or walk for two hours. (R. at 185.) Plaintiff also had the ability to occasionally climb ramps or stairs. (R. at 186.) Further, Plaintiff no longer relied upon a cane for moving about. (R. at 191.) Another non-treating state agency physician, Dr. Martin Cader, M.D, opined that Plaintiff could walk or stand for four hours in a normal day and could occasionally climb steps. (R. at 56-57.)

In describing his ADL, Plaintiff stated that he could walk and drive a car. (R. at 161.) He shopped three to five times a week for roughly an hour at a time, and his injuries did not affect his ability to maintain his finances in any way. (R. at 161-62.) He performed household chores including cleaning, laundry, home repairs and dog grooming. (R. at 160.) Plaintiff

indicated that he could not walk more than half a mile before he needed to rest for up to five minutes. (R. at 163.)

Plaintiff's testimony indicated that Plaintiff shopped for himself, prepared his own food, and spent time kayaking a few times per month. (R. at 39.) Plaintiff also rode a stationary bike for exercise. (R. at 41.) He stated that he had to use crutches only sporadically since the alleged onset date, depending on when he underwent his surgeries. (R. at 35.) He estimated that he could walk for half a mile at a time and he noted that he maintained his ability to drive a car. (R. at 37.) Plaintiff sleeps in an upstairs bedroom. (R. at 33.)

While the ALJ provided only a brief explanation at step three, substantial evidence supports the ALJ's determination that Plaintiff's condition did not meet the requirements of listing § 1.08.

## CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED; that Defendant's motion for summary judgment (ECF No. 13) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure**

21

shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: March 29, 2013