FILED

MAY 2 8 2013

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

WILLIAM BENJAMIN KIERNAN,           )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )    Civil Action No. 3:12CV459-HEH
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

## MEMORANDUM OPINION
### (Adopting Report and Recommendation of Magistrate Judge)

This is an action challenging the Social Security Administration ("SSA")'s denial of

disability ("DIB") benefits to Plaintiff William Benjamin Kiernan ("Plaintiff"). While

deployed to Afghanistan as an active duty member of the U.S. Marine Corps, Plaintiff was

injured by an improvised explosive device ("IED"). Based on his injuries, Plaintiff applied

to the Social Security Administration ("SSA") for disability benefits ("DIB"), but was

denied. After exhausting his administrative remedies, Plaintiff brought this action

challenging the SSA's denial of benefits. The matter is presently before the Court on the

Report and Recommendation ("R&R") of the U.S. Magistrate Judge recommending that the

Court affirm SSA's decision. Plaintiff has raised a single objection thereto. This Court will

dispense with oral argument because it would not materially aid in the decisional process.

For the reasons set forth herein, Plaintiff's objection will be overruled and the R&R

will be adopted as the opinion of this Court. Accordingly, Defendant's Motion for

Summary Judgment will be granted; Plaintiff's Motion for Summary Judgment will be

denied; Plaintiff's Motion to Remand will be denied; and, the decision of the Commissioner will be affirmed.

# I. BACKGROUND[1]

## A. Vocational History

While in college, Plaintiff served in the Marine Corps Reserves. (R. at 580.) Also while in college he held a position as an assistant manager at a coffee shop, managing up to four people and lifting as much as fifty pounds at a time. (R. at 148.) Upon graduating with a Bachelor's Degree in Urban Development in 2008, Plaintiff secured employment with a residential construction company, managing shift schedules and job start dates. (R. at 33, 147.) In this position, he worked forty hours per week, lifting up to one hundred pounds at a time. (R. at 147.) Plaintiff held this position until December 2009 when he was called to active duty and deployed to Afghanistan. (R. at 146, 580.)

## B. Medical History

On September 16, 2010, while serving in Afghanistan, an IED exploded near Plaintiff causing serious injuries. (R. at 202.) The blast caused shrapnel wounds, fractured Plaintiff's right leg and arm, and severed a nerve in the right leg, thereby limiting his mobility. (R. at 202.) Over the ensuing months, Plaintiff underwent more than ten surgeries

---

[1] The following facts are drawn from the administrative record, which has been filed under seal pursuant to E.D. Va. L. R. 5 and 7(C). In accordance with these Rules, this Court will endeavor to exclude any personal identifiers from its discussion, and will incorporate Plaintiff's medical information only to the extent necessary for proper analysis. The Court will reference the record using the following citation format: (R. at [page number]).

to repair soft tissue wounds to his right arm and right leg, a right epicondyle[2] fracture, a series of skin grafts, irrigation,[3] and debridement.[4] (R. at 266-70, 313.) Generally, Plaintiff recovered well from each of these surgeries, with a few exceptions. (R. at 223, 272, 275, 281-82, 286, 296, 297.) On one occasion, Plaintiff suffered an intermittent fever and increased white blood cell count, but he proceeded to his next surgery without complication. (R. at 281-81.) After several of the surgeries Plaintiff reported increased pain, but in each instance he responded well to pain treatments within weeks of any given surgery. (R. at 296,574, 616, 630-34, 935, 943.)[5]

By the end of October 2010, Plaintiff demonstrated good balance when moving from a seated to standing position. (R. at 610.) In November 2010, he reported that he was generally satisfied with the way that his leg was healing and asked to be taken off of the pain prescription oxycontin. (R. at 223, 616.) That same month, he passed a driver's evaluation and returned to his home in Pittsburgh, Pennsylvania. (R. at 205, 454.) Upon discharge from the rehabilitation center in Richmond, Virginia, Plaintiff's kinesiotherapist

---

[2] Epicondyle refers to an eminence on a bone above a rounded projection, usually for articulation with another. *Dorland's Illustrated Medical Dictionary* 402, 630 (32nd ed. 2012) [hereinafter *Dorland's*].

[3] As a surgical procedure, irrigation refers to the cleansing of wounded tissue with fluids, typically to combat infection. *Dorland's* 961, 1009.

[4] Debridement is "the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed." *Dorland's* 473.

[5] In addition to the medical records related to Plaintiff's surgeries, some records indicate psychological symptoms, including trouble sleeping due to "ruminating" thoughts about his deployment and injuries. (R. at 580.) Plaintiff was diagnosed with an adjustment disorder with anxious features, but tested negative for Post-Traumatic Stress Disorder. (R. at 581.) In his objection to the Magistrate Judge's Report and Recommendation, Plaintiff does not raise any issue based upon his psychological condition. Thus, the Court will address Plaintiff's psychological symptoms no further.

noted that Plaintiff could walk over level surfaces and traverse stairways without the aid of a cane. (R. at 237.) Later in November, radiologists noted that a healing fracture in Plaintiff's left femoral condyle had remained unchanged since October, but that his right fibular fracture was healing. (R. at 506.)

In December 2010, Plaintiff experienced some significant limping and increased frequency of pain episodes, for which he was prescribed gabapentin.[6] (R. at 574.) By January 2011, his physical therapist reported that he was doing well, and by February he demonstrated decreased pain and improvement in his overall condition. (R. at 623-24, 630-34.) At that point he could walk without a cane, care for himself and his dog, do household chores, walk, and drive a car. (R. at 158-59, 579.) But by late February and early March 2011, Plaintiff appears to have had a set-back. A loss of dorsiflexion and sensation in his right foot ultimately led to another surgery on his right ankle, performed successfully on March 21, 2011. (R. at 699, 704, 721, 741, 845-46.)

Initially after the March 2011 surgery, Plaintiff could not bear any weight on this ankle, though within a few months he was doing well and feeling no pain. (R. at 935, 943, 948, 953.) By the summer of 2011, Plaintiff could walk without the aid of a brace or walker, he went deep-sea fishing, spent time kayaking, rode a stationary bike for exercise, and he was walking on uneven surfaces while performing community service. (R. at 39-41, 813-15, 935.) But towards the end of the summer, on August 21, 2011, Plaintiff experienced increased pain while bowling. (R. at 797.) Treatments such as elevation, ice,

---

[6] Gabapentin is "an anticonvulsant that is . . . used as adjunctive therapy in the treatment of partial seizures." *Dorland's* 753.

4

and rest did not provide relief, so Plaintiff was prescribed a three-week immobilizer boot treatment beginning on August 30, 2011. (R. at 794.) Despite this treatment, on September 19, 2011—approximately one year after his combat injury—Plaintiff was diagnosed with a closed fracture of the right fibula. (R. at 921.) This led to yet another surgical procedure— an open reduction and internal fixation—followed by rehabilitation. (R. at 872.) By the end of November 2011, Plaintiff was experiencing stiffness in his knee, but reported that his pain was manageable and that he was "doing well." (R. at 869.)

In January 2011, A. Serpick, M.D. ("Dr. Serpick") performed an assessment of Plaintiff's residual functional capacity ("RFC").[7] (R. at 191.) He concluded that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for two hours in an eight-hour work day and sit with normal breaks for six hours in an eight-hour work day; occasionally climb ramps or stairs but not ladders or scaffolding; and, he could occasionally kneel, stoop, crouch or crawl, but must avoid extreme temperatures and humidity. (R. at 185-88.) He further noted that Plaintiff was healing well and no longer relied on a cane to move about. (R. at 191.)

Months later, in June of 2011, Martin Cader, M.D. ("Dr. Cader"), performed a second RFC analysis, reaching a similar conclusion to that of Dr. Serpick with two notable exceptions. (R. at 50-58.) First, Dr. Cader found that Plaintiff could stand or walk for a

---

[7] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities on a 'regular and continuing basis.' A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ must describe the maximum amount of work-related activity the claimant can perform—in an ordinary work setting on a regular and continuing basis—based on the evidence available on the case record. *Id.*

total of *four* hours in a day with normal breaks. (R. at 56.) Second, he concluded that

Plaintiff could *frequently* stoop, kneel, crouch and crawl. (R. at 57.) Based on these

findings, Dr. Cader concluded that Plaintiff was not disabled. (R. at 58.)

## C.    Procedural History

Plaintiff applied for disability benefits on September 28, 2010, claiming disability

under the Social Security Act (the "Act") due to his injuries suffered in Afghanistan with an

alleged onset date of September 16, 2010. (R. at 13, 22.) The SSA denied Plaintiff's claim

in the first instance on January 31, 2011, and upon reconsideration on June 21, 2011. (R. at

13.) Thereafter, Plaintiff filed a written request for a hearing before an administrative law

judge ("ALJ"). After conducting a hearing on November 21, 2011, the ALJ issued an

opinion on February 2, 2012, denying benefits based on his conclusion that Plaintiff was

qualified for jobs in the present national economy. (R. at 20.) Relevant to the issues now

before the Court, the ALJ concluded that Plaintiff did not have an impairment or

combination of impairments that met or equaled that listed at 20 C.F.R. Part 404, Subpart P,

Appendix 1, § 1.08 (hereinafter "Listing 1.08"). (R. at 17.)

On June 25, 2012, Plaintiff filed a Complaint in this Court, contesting the

Commissioner's decision under 42 U.S.C. § 405(g).[8] Both parties filed motions for

---

[8] 42 U.S.C. § 405(g) provides, in pertinent part:

> Any individual, after any final decision of the Commissioner of Social
> Security made after a hearing to which he was a party, irrespective of
> the amount in controversy, may obtain a review of such decision by a
> civil action commenced within sixty days after the mailing to him of
> notice of such decision or within such further time as the Commissioner
> of Social Security may allow. Such action shall be brought in the

summary judgment, which were referred to the Magistrate Judge for an R&R. Upon review, the Magistrate Judge concluded that substantial evidence supported the ALJ's decision to deny benefits, particularly with regard to the conclusion that Plaintiff did not have an impairment or combination of impairments that met or equaled that in Listing 1.08. (R&R at 20-21.) Plaintiff has now filed an objection to the R&R.

## II. STANDARD OF REVIEW

This Court reviews *de novo* any part of the Magistrate Judge's R&R to which a party has properly objected. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). A reviewing court may accept, reject, or modify, in whole or in part, the Magistrate Judge's recommended disposition. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3).

"Determination of eligibility for social security benefits involves a five-step inquiry." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002); *see also Johnson v. Barnhart*, 434 F.3d 650, 653 n.1 (4th Cir. 2005). At the first step, the claimant must demonstrate that she is not engaged in substantial gainful activity at the time of application. 20 C.F.R. § 404.1520(b). Second, the claimant must prove that she has "a severe impairment . . . or combination of impairments which significantly limit[] [her] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). At the third step, if the impairment matches or equals one of the impairments listed in the Act, and the impairment lasts—or is expected to last—for at least twelve months, then it constitutes a qualifying impairment and the analysis

district court of the United States for the judicial district in which the plaintiff resides.

At the time he filed suit, Plaintiff was a resident of this District. (Compl. at ¶ 3.) Venue is therefore proper in this Court. E.D. Va. Loc. R. 3(B)(4).

ends. *Id.* § 404.1520(d); *see* 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing

impairments). If, however, the impairment does not meet one of those listed, then the ALJ

must compare the claimant's RFC with the "physical and mental demands of [the

claimant's] past relevant work." *Id.* § 404.1520(f). If such work can be performed, then

benefits will be denied. Finally, if the claimant cannot perform past work, then the burden

shifts to the Commissioner to show that the claimant is capable of performing other work

that is available in significant numbers in the national economy. *Id.* § 404.1520(g)(1).

When reviewing a denial of benefits by the Commissioner pursuant to 42 U.S.C. §

405(g), this Court must accept the Commissioner's findings of fact if they are supported by

substantial evidence and were reached by applying the correct legal standard. *Hancock v.*

*Astrue,* 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson,* 434 F.3d at 653); *Hines v.*

*Barnhart,* 453 F.3d 559, 561 (4th Cir. 2006); *see also Craig v. Chater,* 76 F.3d 585, 589

(4th Cir. 1996) (clarifying that the question is not whether the claimant is disabled, but

whether the ALJ's finding of no disability is supported by substantial evidence). A finding

is supported by substantial evidence if it is based on "relevant evidence [that] a reasonable

mind might accept as adequate to support a conclusion." *Johnson,* 434 at 653. In other

words, substantial evidence requires more than a scintilla, but less than a preponderance of

the evidence. *Mastro v. Apfel,* 270 F.3d 171, 176 (4th Cir. 2001).

In determining whether substantial evidence exists, the Court must consider the

record as a whole. *Wilkins v. Sec'y, Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th

Cir. 1991). The Court may not, however, weigh conflicting evidence, evaluate the

credibility of evidence, or substitute its own judgment. *Hancock,* 667 F.3d at 472 (citation

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(a). In turn, the regulations define

the phrase "ambulate effectively" as follows:

> Inability to ambulate effectively means an extreme limitation of the ability to
> walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's
> ability to independently initiate, sustain, or complete activities. . . . To
> ambulate effectively, individuals must be capable of sustaining a reasonable
> walking pace over a sufficient distance to be able to carry out activities of
> daily living.  They must have the ability to travel without companion
> assistance to and from a place of employment or school.  Therefore, examples
> of ineffective ambulation include, but are not limited to, *the inability to walk*
> *without the use of a walker, two crutches or two canes, the inability to walk a*
> *block at a reasonable pace on rough or uneven surfaces . . . the inability to*
> *carry out routine ambulatory activities, such as shopping and banking, and*
> *the inability to climb a few steps at a reasonable pace with the use of a single*
> *hand rail. . .*

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(b)(1)-(2) (emphasis added).

While his Step 3 analysis is brief, the ALJ relies upon his much more detailed

analysis set forth in the previous pages of his opinion. (R. at 15-17.)  In those pages, the

ALJ noted the progress that Plaintiff reported over the course of the year since his injuries

and his demonstrated physical activities—yoga, deep-sea fishing, walking on uneven

surfaces, and community service. (R. at 16.)  The ALJ placed special emphasis on

Plaintiff's ability to walk on uneven surfaces, to walk for a sustained period, and to climb

steps—all examples of effective ambulation found at § 1.00(B)(2)(b)(1)-(2). He also noted

generally that Plaintiff was "doing well with exercising" and "had improved strength and

stability in the knee." (R. at 16.)  On this record, substantial evidence supported the ALJ's

and internal quotation marks omitted); *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at

589). Thus, if "conflicting evidence allows reasonable minds to differ as to whether a

claimant is disabled," the Court must defer to the Commissioner's decision. *Johnson*, 434

F.3d at 653. At the same time, the Court "must not abdicate [its] duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." *Oppenheim v.

Finch*, 495 F.2d 396, 397 (4th Cir. 1974) (citations omitted). If the Commissioner's

decision is not supported by substantial evidence in the record, or if the ALJ has made an

error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517

(4th Cir. 1987).

## III. ANALYSIS

Plaintiff has raised a single objection to the Report and Recommendation. He argues

that the Magistrate Judge—and by extension the ALJ—improperly considered whether

Plaintiff had a "loss of function" when analyzing whether Plaintiff met the requirements of

Listing 1.08 at Step 3 of the sequential analysis. Because the phrase "loss of function" does

not appear in Listing 1.08, Plaintiff argues that the ALJ's analysis improperly added an

element not found in the listing. That is the sole issue to which Plaintiff has objected, and

so the Court cabins its analysis to that precise issue. *See United States v. George*, 971 F.2d

1113, 1117 (4th Cir. 1992) ("[T]he court . . . shall make a *de novo* determination of *those

portions* of the report or *specified* proposed findings or recommendations to which objection

is made.") (emphasis added) (citation and internal quotation marks omitted).

The Social Security Administration established the "listings" to define those

circumstances in which impairments reach a level of severity that prevents any gainful

9

activity, such that the applicant is presumed disabled. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). The listings are a regulatory device used to "streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). Necessarily, the regulations establish more stringent criteria to meet the listings than is required to meet the statutory standard for disability. *Zebley*, 493 U.S. at 533. The burden is on a claimant "to show that his impairment matches a listing," and that his condition "meet[s] *all* of the specified medical criteria." *Id.* at 530 (emphasis in original).

At Step 3 of the sequential analysis, the ALJ must clearly articulate the reasons for his decision regarding a listed impairment; a "[c]onclusory statement[] that a condition does not constitute the medical equivalent of a listed impairment [is] insufficient." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009); *see also Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (requiring ALJ to identify listed impairments). "The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review." *Diaz*, 577 F.3d at 504 (quoting *Burnett v. Comm'r of SSA*, 220 F.3d 112, 120 (3d Cir. 2000)). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook*, 783 F.2d at 1173.

In conducting his analysis, however, the ALJ need not use any particular "magic" words or follow a "particular format." *Id.* (citations and internal quotation marks omitted). Where the ALJ analyzes a claimant's medical evidence in one part of his decision, there is

no requirement that he rehash that discussion in his Step 3 analysis. *Smith v. Astrue*, 457

Fed. App'x 326, 328 (4th Cir. 2000) (citing *Fisher-Ross v. Barnhart*, 431 F.3d 729, 733-34

(10th Cir. 2005)); *see also McCartney v. Apfel*, 28 Fed. App'x 277, 279 (4th Cir. 2002).

Listing 1.08 contains the following elements: (1) a soft tissue injury of an upper or

lower extremity, trunk, or face and head; (2) under continuing surgical management, as

defined in 1.00M; (3) directed toward the salvage or restoration of major function; and, (4)

such major function was not restored or expected to be restored within 12 months of onset.

20 C.F.R., pt. 404, Subpart P, Appendix 1, § 1.08. In his Objection now before the Court,

Plaintiff focuses solely on the fourth of these elements, and argues that the ALJ's analysis

adds a fifth element—a showing of "loss of function" as defined in Section 1.00B(2). In

reality, the ALJ simply addressed the fourth element by considering the definition of "loss

of function." He did not add a fifth element.

In total, the ALJ's Step 3 analysis was as follows:

> [Plaintiff's] lower limb fractures, evaluated under sections 1.06, 1.07, and 1.08
> do not meet any of the requirements of those sections and have not resulted in
> inability to ambulate effectively, as defined in 1.00B2b. The claimant does
> not have an impairment that meets/equals; singularly or in combination, any
> impairment listed in Appendix 1.

(R. at 17.) By relying on the defined phrase "ambulate effectively," the ALJ indirectly

relied upon the following definition of "loss of function":

> Regardless of the cause(s) of musculoskeletal impairment, functional loss for
> purposes of these listing is defined as the inability to *ambulate effectively* on a
> sustained basis for any reason, including pain associated with the underlying
> musculoskeletal impairment, or the inability to perform fine and gross
> movements effectively on a sustained basis for any reason, including pain
> associated with the underlying musculoskeletal impairment.

11

finding that Plaintiff could ambulate effectively and, thus, did not suffer a "loss of function" as that phrase is defined in the regulations.[9]

In his objection, Plaintiff does not challenge whether substantial evidence supports the ALJ's factual findings with respect to Plaintiff's loss of function. Instead, he argues that the Magistrate Judge and the ALJ erred in even considering the "loss of function" definition to determine whether Plaintiff met Listing 1.08. (Pl.'s Obj. at 1.) Plaintiff's argument fails for one simple reason. For the ALJ to determine whether a claimant meets Listing 1.08, he must determine whether major function was restored or expected to be restored within 12 months from onset. 20 C.F.R., pt. 404, Subpart P, Appendix 1, § 1.08. Necessarily, he must determine in the first instance whether there was a "loss of function" before he can decide whether such function was restored. Simply stated, Plaintiff asks the Court to apply a hyper-technical reading of Listing 1.08 that would disregard the applicable definitions of related terms. Clearly, Plaintiff cannot meet his burden at Step 3 that major function was not restored if he fails to first establish a "loss of function."

As the Magistrate Judge found here, substantial evidence supported the ALJ's findings with respect to Listing 1.08, and the ALJ applied the correct legal standard.

## IV. CONCLUSION

Based on the foregoing analysis, this Court will adopt the Report and Recommendation of the Magistrate Judge. Accordingly, Plaintiff's Motion for Summary

---

[9] It is worth noting that a "loss of function" could also result from an "inability to perform fine and gross movements effectively on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(a). Plaintiff has not raised any argument with respect to this alternative basis to prove "loss of function," so the Court need not address it.

Judgment and Motion to Remand will be denied and Defendant's Motion for Summary Judgment will be granted. The Commissioner's decision will be affirmed.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
United States District Judge

Date: May 28, 2013
Richmond, Virginia